We will hear argument next in case number 18-1657, Thermalife International against Bill Atkins. Good morning, may it please the court. My name is Bill Atkins, I represent Stanford University. The district court erred below by finding that there was a one gram threshold in the 459 patent. That claim construction was wrong for a number of different reasons. Suppose I did not really think that was a claim construction, so that the issue isn't whether it found a one gram limitation in the 459, but rather that the 459 claim requiring a certain kind of nitric oxide enhancement reaction. As a matter of fact in the world, required one gram, which I gather your expert testified to based on some public knowledge before the filing of the lawsuit. So there are three points I'd like to make in response to that. First of all, the expert was discussing mostly a post 19 post filing. Filing of what? Post filing the patent. But if it's not a claim construction issue, that's really pretty irrelevant. What about, it certainly wasn't post filing of the lawsuit. So in a reply brief, what we put in was a 750 milligram hypothetical. If you put in 750 milligrams, then you could conceivably not infringe claim one, but you could infringe a dependent claim 20. Well, what if, so I think the point is that, you know, you probably understand this, but infringement, there's the two parts first claim construction SEC second comparing the properly construed claim to the accused device. And here, how would that dependent claim be infringed if the independent claim is not? It doesn't make sense to me. There'd be expert testimony saying, you know, the limitations of claim one can't be satisfied unless there's one gram of L-arginine available. And so the limitation claim one still would not be satisfied, even if the range limitation in the dependent claim was satisfied. So I don't understand your answer. So when does claim one actually get infringed, before the study or after the study? So let's just say for the sake of argument that the study that says one gram happens in 1999. The patent was filed well before that. So before that, there is infringement, but afterwards there's no infringement. We're not looking at the time of the filing of the patent to determine whether there's infringement. You look at the time of when the suit was filed, right? I understand your point for claim construction. But if it's a two part process where the question of the one gram comes in the second step, then how can that? How do we look? Why would we look at the filing of the patent to determine the timing of the claim construction? Yes, because you heard from the appellant just before us. If you change the claim terms over time, that's not fair. And what you're doing is applying. I realize I'm talking you're talking about the second step. But the truth of the matter is that you can't infringe before. And then all of a sudden you do. And I'm sorry, that's backwards. You can infringe before. And then when there's a study that says, oh, Eureka, one gram is not effective. Then that becomes non-infringing. Why not? Experts make admissions all the time. Things happen at trial. Facts come out and they impact that second step of the infringement. Because, well, for starters, you're talking about the effective amount, the prophylactic dose and effective amount. If you're talking about that effective amount, what you're saying is that over time that can change, right? Well, the views of experts as to what the effective amount can certainly change. And as Judge Stoll says, that's a matter for the jury to decide whether they believe expert A or expert B, based on the most recent science that they bring into the courtroom. Why is that? That isn't a claim construction issue. That's just a question of whether you've claimed efficacy. And if the other side can prove inefficacy, they win. And if that efficacy is based on a study that comes out well after the patent, that's fine, in your view, because that's the second step in the infringement in the application of the properly construed claim to the accused products, or in this case, the method. Why not? But that effective amount was actually contrary to Claim 20. It's contrary to the specification, the teachings of the patent, and everything from that time frame. The expert here said in 1993, when this patent was filed, they didn't know what the effective amount was. They didn't know precisely what the effective amount was. At the time of the filing of the lawsuit, they did know, and it was a specified amount, or at least according to that expert. That expert said it had to be at least one gram, right? Not at the time of the filing of the lawsuit. When was it? That testimony came up in the invalidity trial three years after the patent expired. Right, but in the fees proceeding, I don't remember. Tell me if I'm wrong. I'm sorry? In the fees proceeding, tell me if I'm wrong about this. I don't remember that there was any argument by your side that the knowledge that the expert attested to in the invalidity trial was not available at the time of the filing of the lawsuit. Not available at the time of the filing of the lawsuit? I think he relied on some sort of, was it some publication that predates the filing of the lawsuit. It wasn't some... So, the testimony was, the gentleman's name was Boger, B-O-G-E-R. Dr. Boger testified in deposition, and at trial, he was asked, hey, there's a piece of prior art that's 0.25 milligrams. Did you require, would 0.25 be effective? And he said no. At trial, he was pushed and said, would 0.25 be effective? Consistent with his deposition, he said no. He said no because the normal human body, according to his testimony, is four to six grams, not kilograms, of arginine. And he went up to 0.5. He said, what do you base that on? There are studies back at the time after filing of the patent, filing the patent, that say that that would be ineffective. He's then pushed for one question and said, well, what about one gram? I don't... And his testimony is fairly obtuse on that, but what he's getting at is he's talking about studies post-filing. Post-filing the patent. Post-filing the patent, sorry. But not post-filing the lawsuit. Correct. All right. I think we should hear from Mr. Biasis since you've abused all your time, including your rebuttal, but we will restore your rebuttal time. Thank you, Your Honor. Good morning. Your Honor, may it please the Court, Robert Biasis from Latham & Watkins on behalf of Thermolife International. I want to go straight to the point that you raised, Judge Bryson, about the question of infringement being for the jury, and that highlights the error in this case because the bifurcation that was pressed by the defendants effectively foreclosed any discovery on infringement, fact and expert. Yet after a five-day bench trial that occurred three and a half years after filing the suit, at that time, the district court found on dispute of fact that there was invalidity because there was a broad range covered by these claims. Right, but the problem here is that there was a lawsuit which was initiated where, at least as found by the district judge, substantial portions of which were inconsistent with known evidence about the amount required for efficacy. That's the way the district judge viewed it. So the problem is not that there was no opportunity to have a jury trial on the asserted claims or the level required for efficacy, but rather that it was brought, this lawsuit was brought at a time that it was either known or should have been known that the amounts at issue in many of these products were not sufficient to be effective. Well, Your Honor, it wasn't known, and we know that in two ways. It wasn't known as of 2013 when the filing of the lawsuit occurred? Correct, because the standard here is whether or not you have a reasonable basis to file a suit. The artificial omniscient standard that's assigned to a quesida is not assigned to a patentee filing a suit. They do not have to know of every single study. And what we had here at the outset of the case were three important facts. One was that the claim itself did not have any limitations. Two was that the Markman order from the prior case didn't incur any limitations. But most importantly, even putting aside the Woods Declaration, what we have is Mr. Kramer's testimony, that he looked at the advertising materials, he looked at the ingredients list, and he compared them to the patent itself. And he said in his testimony that any dose for some of the patents were qualified. And importantly, because of the bifurcation, that was never tested in terms of infringement. But we do know that during the case – Am I right in thinking, this is my recollection, correct me if I'm wrong, that with the exception of Claim 3 of the 006 and its dependent claims, all of the claims at issue required, let's just call it efficacy, the very same efficacy nitric oxide enhancement that was discussed in the 459? I believe it was just the 916 patent also required the sufficiency of the dose. The 874 patent had a specific dose that had to be given on a per milligram per day basis. And that type of dose would establish the efficacy. All of the asserted claims of the 916 had that limitation? The sufficiency? Yes. Yes. And I think it's important in that context because what that shows is the imminent reasonableness of Mr. Kramer's belief that any dose for the 459 patent would have that sufficient amount. Because, and we know that. I'm sorry, I'm very, very confused. If almost all of the claims required efficacy, NO enhancement, I'm using that as a shorthand for the terminology in the 459 and I think most of the rest, then a question would arise if you're filing a lawsuit, would that enhancement occur with the doses that I'm seeing on these labels? It's a factual question. It seems not to have been investigated, and I don't understand why it's reasonable to say any amount would do without investigating efficacy. Well, in terms of efficacy, that's the statements on the labels themselves. But we know from another critical fact that it was reasonable to believe any dose would satisfy that amount sufficient. In the invalidity contentions that the defendants filed, they said, and I quote, for the sufficient term, any amount of L-arginine inherently enhances nitric oxide production. Any amount. So why the bifurcated infringement stayed that? There was no proceedings. In their invalidity contentions, you can see it's a 10-421. It's a 10-421, Your Honor. It also appears on 10, I'm sorry, 10-421. And that was in their validity contentions. Invalidity contentions. Yes. That's what the defendant's position was. Did you have another cite that you were going to give us? Yes. That particular phrase is repeated several times. There's also 10-424 and 10-427. The same statement appears there where they say any amount. I don't recall this argument being made in the briefs. It wasn't made in the briefs exactly. But what the defendant said in their briefing was that they pointed to these invalidity contentions both below and on briefing. And you can find that on pages 29 of Vital's brief and also pages 48 to 49 of Vital's brief and page 66 of Hitech's brief. They pointed to these contentions to show that they did give adequate notice. But what it shows is that it was reasonable at that time. Throughout the three and a half years, the defendants were representing that any amount of bargaining would invalidate. In addition to that, the defendants also for the 459 patent itself said that they asserted products with 105 milligrams. That's at A10403. They asserted invalidity based on a product that had 250 milligrams. That's on A10357. So throughout this case, the defendant's position was any amount of argonine would suffice. That was identical to Mr. Kramer's testimony, that any dose in this particular patent would indeed infringe. Yet the district court decided invalidity in this case by adopting a broad reading of the prior art, that the sufficient amount was 1 milligram to 1,500 milligrams. So the defendants prevailed on their theory that any amount, this broad range, invalidated the patent. I want to back up for a second. I'm looking at page 10, 421. And the claim limitation relied on is, it says, having an amount of L-argonine sufficient to increase the level of nitric oxide production in said human host. Does that differ at all from the claim limitation at issue that we're looking at claim one of the 459 patent? It does not, Your Honor. I mean, it's got different words. It does, but they were construed together and the parties agreed that they should be construed together. And that's at A710 of the appendix. You can see where the district court construed them together and the parties were arguing that they mean the same thing across the 916 patent and the 459 patent. So you have these clear statements for the 459 patent. The invalidated contention said products at 105 milligrams, 250 milligrams invalidated. In the construction of the term for sufficient amount, they said any amount. That's wholly consistent with what Mr. Kramer was saying at the outset of the case. And indeed, they were successful in that strategic choice. They bifurcated, stayed infringement, made these broad claims, took advantage of that to then invalidate the patent, which the district court agreed with. And then instead of packing up their bags and going home on this theory, they changed the rules of the game at the end. And they came back and said, all along, you should have known that you had a one gram amount. And Judge Stoll, you'd mentioned in your previous questions that things do happen at trial. And the only clear statement we had here from the expert that one gram mattered was at trial. But at the outset of the case, that expert's statement did not exist. It was reasonable, shown by the defendants, continued. The district court's opinion suggests that in doing the analysis, that there was no review at all of the labels. Is that true? No. Seems to be contradicted by the testimony. She actually corrected that on reconsideration. She said, I recognize that there are review of the labels. Mr. Kramer's testimony on that fact is very clear. And indeed, he said specifically, I reviewed the ingredients list and he compared them. And one of the objective ways that you can tell that there was analysis here is that unlike prior cases where you had that this court has seen, where you have a nuisance litigants filing all claims on all patents against all products. Here it was carefully parsed. There's different limitations, as Mr. Kramer described, for each of the patents. And so they were matched to the products. And you can see that on page 26 of Stanford's opening brief, where they have a chart. Not all the patents are asserted against all the products themselves. So that in and of itself is objective proof that there was consideration of those dosage levels, combined with the fact that you had throughout it the consideration of the invalidity contention saying that it's any amount. The defendants here didn't just hide under a rock that this court said would be a consideration under stone basket. They built the rock and they dropped it on plaintiffs. At the end of the trial, they changed their tune. And indeed, it also shows that the record was incomplete because the district court effectively granted summary judgment on the disputed question of a complex technical fact without a complete record on it. And that's shown most clearly in the one example that she gave for determining and saying on page 13 of her opinion that there is a basic fact that the labels would show. And that's this five milligram amount that she talks about on that page. That five milligram amount comes from a declaration of vitals attorney. On page Apex 11586, you can see that. There's no support whatsoever given for the five milligram amount. Yet the district court adopted it as fact. That proves in this context that the way that this, the 285 fees were awarded is something that this court has never seen before and it was improper because it was effectively a grant of summary judgment on a disputed fact question. You didn't ask for an evidentiary hearing on the 285 question as I recall. Those words, no, your honor. Well, not only not those words, but you even opposed oral argument if I recall correctly. We opposed oral argument after the district court canceled oral argument. So the way that worked is the district court canceled oral argument and then HITECH moved and we opposed that motion. HITECH wanted to have oral argument and you didn't. It seems to me hard, you're hard pressed now to say, well, not only should we have had oral argument, but we should, as we did, but we should also have had an evidentiary hearing. I think in 20-20 hindsight, that maybe would have been the proper course, but it was a strategic one to oppose something that if you look at the district court denying oral argument on a motion, that does indicate reasonably indicate that the motion will not be successful in that respect. I think that's what they were probably thinking. Your paper filing in opposition to the fees request argued what exactly? It argued repeatedly that there was not adequate opportunity for discovery on infringement. It argued the individual amounts themselves would be reasonable for the 500 amount. And on page 13 of the district court's opinion, that's where she says there was no argument that you could possibly have infringement. It was directed to the 500 amount because the theory was, I believe, that at least the 500 amount that appears in a dependent claim would have to be reasonable. But they did repeatedly say that they needed the opportunity to complete the record. And that's at 11051 of the record. That's also 11053, 11059, and 11063. We call those out in our reply brief at pages 16 to 17 of ThermoLife and go through the litany of asks. But what that highlights here is that there was no opportunity for infringement discovery. Let me ask you a question. Well, you can finish your point, and then I have a question I'd like to ask. You were completing a point. I didn't want to interrupt. Oh, I was just saying that that shows that there was no opportunity here to have a fulsome discussion of what the facts actually were. And indeed, that's confirmed by what the district court did in simply adopting statements in a declaration by attorneys were vital for this five milligram amount. That came from nowhere. Okay. Let me ask you. I found the record to be confusing as to the status of one of Vital's products, the AEXMO. That was a product that, according to the record as I read it, had been discontinued in 2008. It wasn't clear to me. It wasn't originally in the complaint. It wasn't clear to me. It was in the infringement contentions. Yes, Your Honor. But what is your argument with respect to that claim against Vital? Because that's the only claim that doesn't rely on the 459 Claim 1. So in terms of that, you are correct that it appeared in the infringement contentions. That product is mentioned in one of the labels for the other Vital products. And I believe it's a synthesized product, and you can see that label at 11470-71 in the record. And so that's where it came out. And indeed, it did appear in the contentions themselves. And the contentions, you can see in the contentions themselves that A10515 is a label for it. And the contentions for Vital can be found that were asserted just a few months after filing the case, in December of 2013, at A10676 and A6234-59. Well, I guess my question really goes to this. If, with respect to Vital, and not HITECH, but with respect to Vital alone, if it's true, as Vital contends, that the 459 Claim 1 is invalid, or not invalid, but it could not have legitimately been pressed because of the one gram efficacy limitation, all you would be left with, with respect to Vital, would be the AEXNO. And that only, as I calculated, one year of potential liability, because they had stopped selling it in 2008, and the claim was filed in 2013. Would that have been enough, by itself, to support an action against Vital, such that it would have been fine to proceed against Vital without the 459 and the products associated with the 459? By itself, yes, Your Honor. And the reason for that is in the statute, as this Court has discussed in Checkpoint and SFA v. NUA. You do have a statutory right to bring a suit, regardless of the amount of damages. And it simply can't be the case that you could only bring a patent suit if you have above a certain threshold of damages, even if the damages there were small. But for that product itself, it still is contested that it was discontinued. That website that's in the record is showing that it was not discontinued and still on sale as of 2016. So that is still a disputed fact. And that goes, again, back to what the District Court did here in the fundamental error. There was disputed facts here without any opportunity for discovery. And as such, it is a rush to summary judgment without even considering these material disputes of fact. And at the very least, what the District Court had to do. If, indeed, this Court finds that it was unreasonable for some of those products in the 459 patent, or the timing of the expert's admission comes at trial. At the very least, what the District Court had to do was trace the fees and match the misconduct that supposedly happened. Causal connection to the fees that were awarded. But there was no connection here. I think we should hear from Mr. Bianziani now. Thank you. Thank you. Thank you. Good morning and may it please the Court. Frank DiGiovanni on behalf of Vital Pharmaceuticals. This was an extraordinary case of a plaintiff, two plaintiffs, and their predatory strategy to sue 81 defendants. Indeed, virtually the entire supplement industry. Can you focus just on the argued baselessness of the claim and not on the other suits? I'm sorry, Your Honor. I didn't hear that. Please focus on the found baselessness of the individual suit and please ignore, for current purposes, the rest of the lawsuits brought. Okay. Thank you. That's great, Your Honor. So in terms of this case, what Judge Sammartino found, and she lived with the case for four years, was that there was no reasonable basis to allege infringement against Vital or Hitech. But she also found that the defendants, I'm sorry, the plaintiffs, failed to undertake a reasonable pre-filing investigation with regard to the products that were accused and the patents. How does that fit with your invalidity contentions that Mr. Gaiarsa spent some time relying on? Sure, Your Honor. The statement that was just referenced at page 10. 10-421. 10-421. That had never been raised before. This is the first time we're hearing about it. Well, let's just talk about it now because it's been raised. Well, first of all, that appears with regard to a reference called the Flex reference, which in my recollection was not something that was raised at trial or appears in the judge's opinion, invalidity opinion. I think his point was you filed a formal document saying that any old amount will do. So how could it be unreasonable for his client to file a lawsuit on the same premise? Because it was known since 1993 or so that in fact one gram or less was insufficient. Then why did you make this statement? Well, this is the first time I'm seeing this, Your Honor. Well, I know. But this patent, first of all, that was not the 459 patent that this is made reference to. This is a different patent. But isn't this what I heard earlier was that this claim term was construed by both parties to have the same meaning? So that doesn't matter, right? Actually, no, Your Honor. There was no construction of the term amount sufficient. So you're saying this claim limitation has a different – we should give a different interpretation to that? Well, that limitation is a bit different. One of the differences that I just noticed is that in the 459 patent, it's L-arginine and L-arginine hydrochloride. This limitation here is something different. It also – No, it just says L-arginine and it's physiologically acceptable salt. Right, and actually – It sounds to me like you just said the same thing. Well, it's a little bit different because in the prosecution history for the 459 patent, which is in our brief, they disclaimed any other salts other than L-arginine hydrochloride. So there is a difference between that limitation that's being addressed in that claim chart and the limitation in the 459 patent. But if there are differences in the limitations, doesn't that highlight the potential problem with the district court having focused only on the 459 and not the others? I would say no, Your Honor, because what's required is an amount sufficient. So in order for the plaintiffs to file suit, in order for them to do the pre-filing investigation, they needed to conclude that in fact the products, the accused products, met the limitation. And there's nothing in the record. We challenged them on their exceptional case motion about their pre-filing investigation. We said they didn't and they couldn't have made a proper analysis of the products and compared them against the patent. And what did they come back with? There's nothing in the record. They had labels. They had advertisements that they looked at that said that it satisfied the claim limitation, right? And the district court said that the advertisements weren't sufficient. But I guess in juxtaposition with this statement by your client that, you know, it doesn't matter how much so long as some amount is there that it will satisfy the limitation, that's a little disconcerting. Well, I guess I would say to this, first of all, that's not the 459 patent. So my client was not interested in that patent because the 459 is what was accused. Who drafted this? On behalf of which of the various parties to the invalidity proceeding was this submitted? Was this submitted on behalf of all parties? I don't know, Your Honor. It's titled defendants S apostrophe. Defendants jointly work together, and that's why the case proceeded as it did. All the parties and the judge were asked to be efficient, and we proceeded on invalidity only. So I believe it was defendants' contentions. Now, if I understand it correctly, the 459 and the 916 have efficacy requirements in them, amount sufficient to produce endogenous NO. The 872 and the 006 do not. Is that fair? Your Honor, my client was accused of… Before you get into your client, is that a fair characterization of the way the patents break down? And the answer is I don't know because my client was only accused of the 459 patent. Your client being vital? My client being vital. But you were accused of the AEX NO, even though all through the record it's unclear whether the AEX NO is part of the case or is not. But as far as I can see, at least as of the time of the infringement contentions, it was as far as the plaintiffs were concerned. So there you were accused under the 872 and the 916, the 872 being a non-efficacy-based claim, right? Again, Your Honor, the two products that were in the complaint were NO synthesized and NO… But the complaint said these products, but not limited to these products. And sure enough, when you got to the infringement contentions, in came AEX NO. And that, even though it was only in for a small period of time, one year roughly, it's still subject to an infringement claim. So why would your client not have been subject to a lawsuit based on AEX NO? I would say it hadn't been added to the case. It was in the infringement contentions, but it had not been added to the case. Why had it not been added to the case? It was in the complaint by implication through the reference to other products. And then when the infringement contentions came in, it was noted to be one of the products on which infringement was predicated. Why doesn't that constitute enough to add it to the case? Our position is that that was insufficient. They needed to amend the complaint. And in any event, each of the products, as in the Antonius case, each of the products need to be assessed on a product-by-product basis. And that was not done here. So if you look at NO Synthesize, if you look at NO Shotgun, these are the two principal products. These are the two products, we would say, that were accused. There was no record whatsoever that these could have infringed or that they did infringe or that, in fact, they even had any kind of basis to allege that they infringed. Can you tell me what does the record say, in particular, but not only, the record on the fees request, about what testing activities the plaintiffs could have undertaken to go beyond the labels on the accused products, beyond the advertising of the accused products, to figure out how much L-Arginine was in a particular recommended serving? The record does not explain what they could have done, but certainly they could have done testing. In fact, their own expert— Well, if the record doesn't say, but certainly, that is a problem leaping from one to the other for me. Your Honor, it was their burden to demonstrate that they could have, that they did assess the infringement. The district court said there was an inadequate investigation. Let's assume that there is no scientific possibility of taking the pills or whatever form these things are in and figuring out in a 500-milligram pill with 12 listed ingredients how much L-Arginine is in there, so that there is nothing but labels and advertising. At that point, isn't it a little odd to find that there was an inadequate investigation when one hasn't identified what investigation was possible but not done? Your Honor, there was no investigation even necessary. Their expert said there was a known fact from science that, in fact, less than one gram of L-Arginine would not increase nitric oxide in the bloodstream. Is it true that that was, that the expert said that three years after, you know, into the filing of the lawsuit? He testified to it in his deposition that's cited by the district court and in our brief. And then he tested, he repeated that at trial. And that was known prior to the filing of the complaints. It was known sometime in the mid-'90s and any time after that. And their expert conceded that. You responded to the argument that the person doing the investigation didn't have to be one of ordinary skill in the art and have knowledge of all the different articles regarding how much was required. They still had to have some basis under the district court's case law to allege infringement of these products. And they, when we challenged them on it, they have yet to come forth with anything where they say, here's how we understood that you infringed. They didn't explain that. In fact, Judge San Martino says it in her opinion, that they've never actually challenged the fact that there was any reasonable basis to accuse Vital's products of infringement.  A number of the accused products have recommended servings well over one gram, some eight grams, measured in milligrams, 8,000 grams, 3,000 grams. And they say, here are a few ingredients. Do we know anything about whether they could have done some tests, get the pills that are in the servings, and figure out how much of the, let's say, eight grams is L-arginine? Because if the answer is they couldn't, then I'm not sure what the inadequacy of the investigation was. You're right. I don't believe it's in the record regarding what type of tests were done. And this may be utterly obvious to every scientist in the field, but if it's not in the record, I'm not quite sure what to do about that. Well, Your Honor, what we do know, though, is as of the date of the filing, it was known that less than one gram of arginine could not have been. Right. Let me focus you because I think you're not quite getting what I'm asking. Let's assume it was known you needed a gram. You now have a bottle that says, here's a pill, one serving, it's eight grams. How do you know whether there's more than one gram of L-arginine in there or not? If each pill was half a gram and it had 20 ingredients, you know there's not one gram. But a bunch of the pills here, the accused products, have servings of much greater than a gram. So the question is, how would they know whether there was one gram in the accused products? I would say this, Your Honor. The amount of the ingredient could have been learned and then tested itself by itself as opposed to testing it with all the other ingredients. So you just said that. Yes. And what in the record supports that? Well, I would say, Your Honor, the fact that it was known in the art, as Dr. Bauger said, that one gram or less does, it tells you you can take a particular amount and test that amount. Otherwise, he would not have been able to have the knowledge that less than one gram actually is insufficient. Well, I'm confused now about when you say the amount. The amount of what? Because if I understand, correct me if I've got the numbers wrong, but if I understand it correctly, again, going back to your products only, let's not talk about high-tech products, but your products, AEXNO had 3.2 grams of arginine. Is that correct? I believe that's correct, Your Honor. All right. And the other three products, well, two of the other three products, the shotgun products, had less than 500 milligrams of arginine per serving? Less than five milligrams. Less than five milligrams is actually a declaration. Well, there's one place where I see 500 and another place 500. I don't know if that's a typo, but certainly no more than 500. It was less than five milligrams. Yes, you're right, Your Honor. There is two different declarations, but they're both accurate. It's less than 500. Well, perhaps it is. Sure. Tell me why they're both accurate, one saying 500 and the other saying five. It's saying in the product there's less than 500 milligrams. It's true. I see. I see. In other words, less than five equals five? No, not equals five. It's less than five. Includes five? Exactly. Okay. Yes. All right. But in any event, certainly less than 500 with respect to the two shotguns. And then Enosynthasize, no arginine. That's correct, Your Honor. There's one product that has no L-arginine and no L-arginine hydrochloride. For plaintiffs to look at that label and accuse it of infringement is completely shirking the responsibility of a pre-filing investigation. There's no way that possibly could have infringed, yet they accused it throughout this entire case. I think we should hear from your colleague. Thank you, Your Honor. Thank you. May it please the Court, Robert Parsley for high-tech pharmaceuticals. The district court did not look only at the pre-filing investigation for the 459 patent. It looked at the entire pre-filing investigation. And the sum total of the record evidence concerning the pre-filing investigation was a handful of sentences from Mr. Kramer's deposition, testimony. That's it. He said, and I'm quoting, check existing products for their marketing claims and ingredients. And then... Are you reading from the Kramer deposition testimony? Yes, Your Honor, and it would be at appendix 10187. Do you have any recollection of how it was determined that somebody was an infringer? What's your recollection? This is 10187. Check existing products for their marketing claims and ingredients. Question, what marketing claims would indicate they were an infringer? If they said arginine was going to increase nitric oxide or if the label had a certain dose of arginine in the product. Then there was some discussion about dosages. That's it. That's the entire record evidence on pre-filing investigation. What was not done here? What is not in this evidence? There was no analysis of the patents, of the prosecution history. There was no careful comparison of the patents to each of the products. I'm sorry. I thought the sole basis on which the district court found it was unreasonable to proceed was a factual determination that for the claimed effect in many of, though not all of the claims at issue, a certain effect on the body was necessary. That pre-lawsuit science said one gram was necessary. That I thought actually you had been contending was actually not a matter of claim construction at all, but the application to the real world of an effectiveness requirement, an efficacy requirement. Correct, Your Honor. But that was not the sole basis for the court's opinion. No, but you started talking about claim construction, prosecution history. What does that have to do with anything? Well, I was trying to lay out things that Thermalife could have done by way of pre-filing investigation to show that it was... What could it have done to determine whether each of or all of the accused products were including one gram or more of L-Arginine? Well, could have looked at Zincor Plus's label, which said a serving is one caplet and a caplet contains 325 milligrams total. Right, so there are a few of these in which the servings are well under one gram and it's a little hard to see. Mesomorph had no L-Arginine. Right, I think there are like five or so in which the servings were well over one gram. That's right, but for the other patents, two of the patents, there were other antioxidants had to be included. There was no testimony that he was determining that other antioxidants were in the products. Can I direct your attention for a minute to appendix page 10, 357 and 358? This is another one of those validity charts, but this one seems to relate specifically to the 459 patent. Okay. Yes, Your Honor. I just wanted to ask, I see here, I mean, that it seems to me this is, if you look on page 10, 357, it's the prior reference is Wheater and it says that it has 250 milligrams of Arginine. And then you go down to, on page 10, 358, limitation 1.4, which is the, in an amount sufficient to enhance endogenous endothelial nitric oxide. And the chart says the formation of nitric oxide was a known and inherent benefit of the administration of L-Arginine. How do you respond to that? Why doesn't that show that it would have been reasonable at the time of filing the lawsuit to think at least for 250 milligrams of L-Arginine, you would have the claimed benefit? Well, I think on page 10, 358, when it's saying that NO was a known and inherent benefit of the administration of L-Arginine, it's presuming that there's an amount sufficient. And it doesn't speak there to what an amount sufficient is. Well, let me just press just a little bit more. In the prior page, it says that the capsule contains 250 milligrams of Arginine. So, there's at least some minimum provided there on page appendix 10, 357. Right. I don't think there's, I mean, we don't know how many caplets were taken. We don't know if it was, you know. Doesn't that also apply to the infringement analysis? That the amounts of caplets taken or what the overall dose would be in a day, for example? Right. The argument you're making. Why wouldn't that apply also when you're assessing whether there was infringement at the time of filing? Well, I think we would have expected to see, at a minimum, a careful analysis by counsel going through these patents claim by claim and comparing them to the products, the ingredients in the products, the recommendations for how the products are to be used. That we would have expected to see that before these lawsuits were filed and that did not happen. There is no record evidence that that ever occurred. If it turned out that a whole lot of these products, in fact, had more than one gram in a serving of the L-Arginine, would it be a basis for exceptionality that there wasn't enough investigation before the suit was brought? If it turned out that investigation would actually have revealed? Well, that's an interesting question, Your Honor. I mean, I think. I thought it was a premise of the district court that, in fact, there wasn't infringement. And if only they had done an adequate investigation, they would have figured that out. As to the 459 patent, which was illustrative, the court, district court, found that the pre-filing investigation as a whole, as to all products, was recklessly inadequate. Okay? And I would also say that under HALO. Reckless drivers don't always have accidents. So, suppose they had been reckless. I'm asking the same question, but I'm really interested in your answer. Suppose that they had done this very superficial examination, and it turns out, as Judge Serrato's question indicates, that there was plenty to have efficacy. Would that be a basis for fees? Well, I think that under the circumstances of this case, yes. If ThermoLife and Stanford got lucky that it just so happened that there might have been a possibility of infringement, had the patents been valid, doesn't excuse all of the other conduct that was taken. But the Rembrandt case, for example, and others, stands for the proposition that the misconduct has to have some causal relation to the injury suffered. And here, if, in fact, there was plenty of the product of the arginine to constitute infringing amounts, then there would have been no injury. Well, I think another angle here, because we've had some new angles at argument here, is that these patents were returned back to Stanford from the previous licensor, because in light of the Supreme Court's opinion in KSR, thought, these are going to be invalid, it's obvious. So, shouldn't that have been analyzed? But that was not part of the district court's analysis here, or rationale? It was not, but the court can obviously affirm for any reason supported by the record. Speaking of issues that have come up for the first time, do you have any comments on the invalidity contentions, particularly 10421? Well, I mean, I would just object because there is plenty of case law that raising a brand new argument or issue for the first time, or argument by the appellant, is improper. Just as we had new issues raised in their brief, and that's not something we've had a chance to analyze or get ready for. That said, I would substantively respond, and I would say that the statements in there saying that, you know, that arginine increases in oast does not necessarily mean that any amount would be an amount sufficient. So, in opposing your request for fees, did the plaintiffs argue that discovery and factual inquiry into the whole infringement question, or part of it, was necessary? No, Your Honor. That was never squarely presented to the district court. It was all after, I mean, it was after the fact when you're getting to the oral argument or the motion for reconsideration, and they're saying, well, we needed all this more discovery. We could have put in more evidence about, you know, the infringement analysis. But the fact is, the plaintiffs had their opportunity to do that, and they didn't take it, and they wait until the end when things don't turn out their way to start throwing these arguments out. But there was never really a squarely made request for an evidentiary hearing, for discovery, for anything of that sort. Now, on that, on one more point, just to make sure I understand, your argument, and I appreciate that you're hitting this cold, but your argument with respect to the invalidity contentions was that they're not saying that any amount would work. My point is, it doesn't. That's exactly what it says. Well, Your Honor. Any amount of L-Arginine inherently enhances nitric oxide, so I don't think that argument gets you anywhere. Well, Your Honor, I'm just not prepared to answer that particular question. All right. Quite honestly. Thank you. Thank you. Asking you to confirm. Restore two minutes for Mr. Adkins. I have four points. First of all, why the Stanford patents were returned to Stanford. They point to an obviousness, Supreme Court. There's no basis. That's attorney argument. Second, White v. Dunbar, the nose of wax. That's exactly what you're seeing here. More recently in Amazon, which is, let's look at invalidity and let's look at infringement in two different ways. They should be looked at similarly. In answer to the question that was before, invalidity was brought up certainly in the Stanford reply brief at page 11. If we go back in time, the Northern District of California construed the claim sufficient amount. That's at A-534. That's well before these cases were initiated. The patented issue at column eight, line 16 through 21, A-425, tells how dosages vary using people that are young or old. What they've already got in their system, what they're going to add to their system. All of those were around. But what I want you to do, if I could, have you open up to one page, A-710. The discussion was that amount was not construed before. A-710, as you turn to it, is defendant's opening claim construction brief. As you go down to line 19, Johnny and I just, sorry. As you go down to line 19, you'll see there is no support in the intrinsic record for limiting this phrase to a routine or typical dosage. That's defendants saying there's no limit. Now the question for you all is, okay. You say there's no limit here in your claim construction brief. But once invalidity is over, you turn to the one gram and cling to it. That's not fair and that's not right. That goes to the whole claim construction issue. Your rebuttal time has just ended. I'm sorry. Thank you. I'll hear from Mr. Gallarza. Five minutes, please. Can you point me to the filing you made in the district court in response to their fee request? I believe it starts at 11-051, Your Honor. And I did want to read a portion in response to your question, Your Honor, that there was no idea. I believe my friends on the other side said there was no request for more discovery. But it's very clear, and I want to read that to you. At 11-059, we said below, if the court would now engage in the detailed infringement analysis of products relative to the patent claims it has already invalidated, extensive discovery would need to be taken. As a non-infringement position, defendants assert without any expert testimony are wholly unsupported. I'm not sure how more clear they could be that they needed more discovery to address it. I did also want to address a few other points. There was a question about whether or not those invalidity contentions were by one party or by multiple. It was actually signed by all the parties. That was at 10-221-22. Also on that point, Judge Stoll, you had pointed to the 250-milligram product. There's also another product, creatine 5000, asserted specifically against the 4-5-9 patent. And that's at 1-0-4-0-3, and that's 105 milligrams. Again, that cites 1-0-4-0-3. So it's not just 250, it's 105. And in those invalidity contentions, they did say it's an inherent property. And as I said, in that same claim term that they're reading both ways for both patents, that they read it both ways as saying any amount, which is identical to Mr. Kramer's understanding at the outset. In addition, if you – So I assume, I mean, is this right or not, that your theory of why we might in fact be able to rely in some way on some of these invalidity contentions is that when you did make the argument to the district court that discovery and further record development on infringement was necessary, this is a way of showing why that would not have been a futile exercise? It's one of two ways, yes, Your Honor. But for the invalidity contentions themselves, the only reason they're in the record is because defendants put them there. They're in the record for fees because they said, look, it's reasonable to say that this had no basis. And it's reasonable to say that we didn't give you notice specifically on – You're arguing – so they argued, as I understand what you're saying, they argued when they were seeking attorney fees, they didn't just rely on infringement. They also relied on validity and how clearly invalid the patents were. The argument wasn't well-developed. What they were doing is responding to the lack of notice. And they did the same thing on appeal. If you look at Vital's brief at pages 29, 48 to 49, and Hitech's brief at 66, they also cited the infringement contentions here on appeal. The invalidity – Sorry, correct, yes, invalidity contentions here on appeal. So, I'm sorry, just in the district court, the defendants put in these invalidity contentions in response to your opposition to fees? I believe they put them in in the opening. And those citations in here are from the opening. I'm not sure if it was Vital or Hitech's motion, but it was one of the two parties had it in the opening, I believe. And just again to clarify, what was the point that the defendants were making when putting these invalidity contentions into the record? I believe they responded to two things, as they do on appeal, to show that they didn't have to give notice, but also to show in the totality that potentially it was unreasonable to bring the claims to begin with. I believe that second one is probably what they're more thinking below. And on appeal now, what they're relying on is directly to respond to the lack of notice. But the lack of notice here – I'm sorry, did you? No, no, go ahead. In terms of my answer to your question, Judge Ferrando, I promised you a second point in terms of the reasonableness. And that goes back to what my friend was discussing about this five milligram amount that came in the Keston Declaration, which is found at 11,586. That five milligram amount doesn't exist. Indeed, he said it was clear, but if you look at the labels themselves, the label for synthesized says 9,352. What's the unit on that? I'm sorry? You're saying the labels at 9,352? Yes, the label says 9,352, and that's it. That's kilograms per serving, right? That's per serving, yes. But that's not of arginine. That's not of arginine. Indeed, if I understood the record correctly, I thought N-osynthesized had no arginine in it. N-osynthesized does not, and there's two points. So what's the point of the 9,000? It has the salt. And so what the instructions say is take it with water. And as any high school chemist knows, if you put a salt in water, it's going to disassociate. And that point was in the original infringement contentions. They listed the- And how much of the salt is in N-osynthesized? It's not specified, and that's the problem. It says 9,352, and it lists them in the top 10 ingredients in that. In addition, the label for N-osynthesized, and this is at 11,470 to 71 of the record, it doesn't just say take this once. It says take it immediately before, during, and after your workout. So you have three doses in close succession. And it also says take it with the shotgun product, which does have arginine. And that shotgun product on its label has 4,890 milligrams of a blend including the salt and 6,160 milligrams of a blend including arginine and another salt. Is there an indication in the record as to how much arginine is in each of those shotgun and shotgun and MHF? Not at all, and that's the problem here. That goes back to the fundamental issue where we said we needed to test what the declarants were saying. That declaration for 5 milligrams had no basis. It was an attorney for Vital who said 5 milligrams. There was no explanation. There was no scientific explanation about where that 5 milligrams actually came from. And, indeed, that is one of the fundamental problems with this decision here, is that it was a rush to summary judgment on a disputed material fact. I think we have. Can I ask just one last question, which is just in understanding your point with respect to the validity contentions, is your point also that your client's understanding of what was required for the claims at the time of filing was reasonable as shown in light of these validity contentions? I'm just trying to understand. It confirms it, Your Honor. It confirms that the defendants also thought it. And in context, what happened then thereafter was the district court also believed that, too, and found as part of the invalidity decision here that the prior art said 1 milligram to 1,500 milligrams was a sufficient dose and credited the defendant's expert for that finding and on that basis. I mean, do you agree with counsel for the other side that nothing in the record identifies what kind of experimental process your people might have gone through with a bottle of the 9,000 milligram to figure out how much L-arginine was in there? I looked through the record, Your Honor. I did not find anything that would indicate what additional testing could be done. Thank you. Thank you. Case is submitted.